** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | |
|---|---|
| MOTIVA PATENTS, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>SONY CORPORATION ET AL.,<br><br>    Defendants. | CIVIL ACTION NO. 9:18-cv-00180-JRG-KFG<br><br>    JURY TRIAL DEMANDED |

**<u>OPPOSITION TO OCULUS'S MOTION TO DISMISS OR TRANSFER</u>**

**\*\* Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only\*\***

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     MR. DUFFEY'S DECLARATION SHOULD BE EXCLUDED ................................... 3

III.    OCULUS HAS NOT COMPLIED WITH ITS DUTY OF CANDOR ........................... 6

IV.     VENUE IS PROPER .......................................................................................... 7

        A.      Oculus Established A " ██████████████████ " In Plano .................. 7

        B.      The Oculus " ████████████████ " Experience ............................... 9

        C.      The Mystery "Third Party Vendor" Of Oculus's Motion Is The Vendor
                *Oculus* Engaged To Staff Its ████ 's With "Oculus ████████████ " ........ 10

        D.      Oculus Directs Customers To Its Plano " ██████████████████ " ..... 11

        E.      Oculus's " ████████████████ " Is Oculus's Place Of Business .... 12

        F.      Oculus Has Committed Acts Of Infringement In The District ........................ 14

V.      THE NORTHERN DISTRICT OF CALIFORNIA IS <u>NOT</u> CLEARLY MORE
        CONVENIENT THAN THIS DISTRICT .................................................... 14

        A.      Relative Ease Of Access To Sources Of Proof Weighs Against Transfer ......... 15

                1.      Motiva Has Significant Documentary Evidence Here ........................... 15

                2.      Oculus's Documents Are Accessible From Anywhere And Are
                        Physically Located "Somewhere On The Planet" .................................. 17

        B.      Availability Of Compulsory Process Weighs Against Transfer ........................ 19

        C.      Cost And Convenience Of Witnesses And Parties Weigh Against Transfer ..... 21

        D.      Other Practical Problems Weigh Against Transfer ............................................ 24

        E.      Court Congestion Weighs Against Transfer ...................................................... 24

        F.      Local Interest Weighs Against Transfer ............................................................ 25

        G.      Familiarity With Governing Law Is Neutral ..................................................... 25

        H.      Avoidance Of Conflict-Of-Law Issues Is Neutral ............................................ 25

VI.     CONCLUSION ................................................................................................. 25

**\*\* Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only\*\***

# TABLE OF AUTHORITIES

**Cases**

*Agis Software Development LLC v. HTC Corp.,* No. 2:17-cv-514, Dkt. No. 77
(E.D. Tex. Sept. 28, 2018) ................................................................................................. 25

*Aloft Media, LLC v. Adobe Sys. Inc.*, No. 6:07-cv-355, 2008 WL 819956
(E.D. Tex. Mar. 25, 2008) ................................................................................................. 20

*iFly Holdings v. Indoor Skydiving Germany GMBH,* No. 2:14-cv-01080,
2015 WL 5909729 (E.D. Tex. Oct. 7, 2015) ..................................................................... 25

*In re Cordis*, 769 F.2d 733 (Fed. Cir. 1985) ..................................................................... 12

*In re Cray Inc.,* 871 F.3d 1355 (Fed. Cir. 2017) ......................................................... 12, 13

*In re Genentech, Inc.*, 566 F.3d 1338 (Fed. Cir. 2009) ............................................... 15, 24

*In re Google*, 2017 WL 977038 (Fed. Cir. 2017) ............................................................. 24

*In re Hoffman-La Roche Inc.,* 587 F.3d 1333 (Fed. Cir. 2009) ................................... 19, 25

*In re Vistaprint Ltd.*, 628 F.3d 1342, 1347 (Fed. Cir. 2010) ............................................ 24

*In re Volkswagen of Am., Inc.*, 545 F.3d 304 (5th Cir. 2008) ............................... 14, 15, 19

*Net Nav. Sys., LLC v. Cisco Sys., Inc.*, 2012 WL 7827544 (E.D. Tex. Aug. 24, 2012) ............. 24

*Novelpoint Learning LLC v. LeapFrog Enters., Inc.*, No. 6:10-cv-229,
2010 WL 5068146 (E.D. Tex. Dec. 6, 2010) ..................................................................... 21

*Rockstar Consortium US LP v. Google Inc.*, No. 2:13-CV-893, 2014 WL 4748692
(E.D. Tex. Sept. 23, 2014) ................................................................................................... 6

*Texas Data Co., L.L.C. v. Target Brands, Inc.,* 771 F. Supp.2d 630 (E.D. Tex. 2011) .............. 16

*Tidel Eng'g L.P. v. Fire King Int'l., Inc.,* 2008 WL 899345 (E.D. Tex. 2008) .......................... 21

**Statutes & Rules**

28 U.S.C. § 1400(b) ........................................................................................................ 7, 14

Fed. R. Civ. P. 43(c) ............................................................................................................. 5

Fed. R. Evid. 602 .................................................................................................................. 5

**\*\* Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only\*\***

## I.     INTRODUCTION

Oculus would have the Court believe that the accused Oculus products are merely displayed and sold at the Best Buy in Plano just like "thousands of other products are similarly displayed and sold . . . ."  Motion at 6.  If that were true, Oculus might have had a good argument that it does not have a place of business here.  But it is not true:









As shown in these pictures (which were taken at the Best Buy in Plano), *Oculus*—not Best Buy and not some random, unrelated third-party vendor, but *Oculus*—demonstrates accused Oculus products to customers.  Oculus does so in special "████████████████████████" within Best Buy stores that are dedicated to its Oculus products, including a "█████" that Oculus established within the Best Buy store in Plano.  Oculus provides these demonstrations at fixed,

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

regular hours at its ▮▮▮ in Plano.  And Oculus specifically directs local customers to its ▮▮▮ in Plano through its live.oculusvr.com website.  These facts—which Oculus simply ignores—establish that Oculus has a place of business here.

Oculus would also have the Court believe that "all activities related to development of the accused Oculus Rift and Touch products are performed in Menlo Park or Redmond Washington."  Motion at 14.  If that were true, Oculus might have had an argument that some factors weigh in favor of its alternative request for a transfer to California.  But that's not true either.  Not even close.

Oculus forgets that it has an office in Dallas, where key Oculus engineers have worked on, and continue to work on, the accused Oculus products.  Indeed, John Carmack—shown proudly wearing his "Oculus Dallas" t-shirt at a recent Oculus conference—works from the Oculus Dallas office. Mr. Carmack is the Chief Technology Officer of Oculus. He, and his crew of trusted software engineers and developers—many who previously worked for Mr. Carmack before he joined Oculus—work on accused Oculus products in Oculus's Dallas office.  And as the recent multi-hundred million dollar verdict against



Facebook in the ZeniMax trial confirmed, Mr. Carmack was also involved in the early development of the Oculus Rift even *before* he left ZeniMax to join Oculus.  Yet Oculus's motion and supporting declarations do not so much as allude to Mr. Carmack, Oculus's Dallas office, or any of the other Oculus engineers who have worked on the accused Oculus products in Dallas.

**\*\* Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only\*\***

These facts—and many others, including Motiva's connections to the district, the judicial efficiency in keeping the case here with the co-pending cases against HTC and Sony, and the delay that would result from transfer—show that transfer to California is unwarranted.

## II.     MR. DUFFEY'S DECLARATION SHOULD BE EXCLUDED

Oculus's motion is premised on the declaration of Michael Duffey, a paralegal in Facebook's (not Oculus's) litigation group.  As will be explained below, much of what Mr. Duffey said in his declaration is false, or, at best, misleadingly incomplete; and even taking the facts stated in Mr. Duffey's declaration as true, Oculus's motion should be denied.  But there is an important evidentiary issue that should be addressed as a preliminary matter:  Mr. Duffey has no personal knowledge regarding most of what he said in his declaration.  In fact, the basis for most of what he said in his declaration was nothing more than what Oculus's attorneys told him to say.  On the key issues, Mr. Duffey's declaration is incompetent and inadmissible evidence.  It should be excluded.

Mr. Duffey has worked for Facebook for less than two years.  *See* Ex. 1 at 10:3-9 [Duffey Depo].  The entire time he has worked for Facebook, he has been a member of Facebook's litigation team.  *Id*. at 10:10-14; 13:6-10.  His title is "E-Discovery and Litigation Project Lead." *Id*. at 10:10-18.  For more than a decade before he started working for Facebook, Mr. Duffey was employed as a patent litigation paralegal at various national law firms, including Ropes & Gray, Howrey LLP, Orrick Herrington, and Day Casebeer.  *Id*. 13:6-14:6; 14:22-15:15; 16:2-4.

Mr. Duffey has never had responsibility for, or been a member of a team having responsibility for, the matters addressed in his declaration.  He has never worked within any human resources department, management team, engineering team, marketing team, or finance department.  *Id*. at 19:2-20:1.  He has never been responsible for, or part of a team responsible for, managing how Oculus demonstrates its products.  *Id*. at 20:2-5.  He has never had

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

responsibility for, or been a part of a team with responsibility for, the relationship between Oculus and Best Buy or the relationship between Oculus and Premium.  *Id*. at 20:6-15.  His role at Facebook has been exclusively as a member of Facebook's litigation team, trying to do "what's best for the company."  *Id*. at 129:17-128:2.

Mr. Duffey's basis for most of what he declared was simply what Oculus's lawyers told him to say:

- "I worked with in-house counsel to — to – to verify the statements in my declaration . . . ."  *Id*. at 25:20-26:5.

- "I spoke with an in-house attorney at Oculus about – about this, and – and- and was told that there was – that Facebook did not own or lease any space within the Best Buy stores. . . . That was my basis, the conversation I had with Mr. McCone."  *Id.* at 76:2-77:12.

- "[T]he basis for [the statement regarding where live demonstrations occur and who provides them] was, again, my conversation with Mr. Mecone."  *Id*. at 78:6-23

- "[T]he basis of [the statement about the third-party staffing vendor]" was "[t]he conversation I had with Mr. Mecone" and nothing else.  *Id*. at 78:23-79:6

- "[T]he basis of [the statements about the hiring, training, and management of the third party vendor]" was "the conversation I had with in-house counsel, Mr. Mecone, for Oculus."  *Id*. at 79:7-18.

- He "didn't do anything independent to verify that what Mr. Mecone told [him] was accurate" with "regards to paragraph 10" of his declaration.  *Id*. at 79:19-21.

- The basis for his statements in paragraph 9 of his declaration "was the conversation I had with Mr. Mecone."  *Id*. at 79:22-25.

- "Mr. Mecone knew the fact that he told [him]" because "he had conversations with others about the Best Buy demonstration" but he does not "know who Mr. Mecone talked to to get information about" that and "it's possible that those individuals got their information by talking to other individuals . . . ."  *Id*. at 80:6-22.

That Mr. Duffey lacks adequate knowledge for the matters set forth in his declaration is clear from the declaration itself.  Rather than declaring that his statements were based on

personal knowledge, Mr. Duffey "declare[d] that the following statements are true to the best of my knowledge, information, and belief, formed after a reasonable inquiry under the circumstances." Dkt. No. 16-1 at ¶ 1 [Duffey Decl.]. That starkly contrasts with the personal knowledge that Mr. Duffey declared in other declarations that he submitted on behalf of Facebook in the past. *See, e.g.,* Ex. 3 [Palmucci] ("I submit this declaration based on my own personal knowledge . . . ."); Ex. 4 [Doe] ("I submit this declaration based on my own personal knowledge . . . ."); Ex. 5 [NFHA] ("I have personal knowledge of the facts stated herein . . . .").

Moreover, when deposed, Mr. Duffey *flat-out admitted* that he lacked personal knowledge for most of what was contained in his declaration. Mr. Duffey claimed to have personal knowledge for only the following statements included in his declaration: (1) that Facebook Inc. and Facebook Technologies are Delaware entities (paragraph 2); (2) that Facebook headquarters are in Menlo Park (paragraph 2); and (3) that Facebook does not have any offices in this district (paragraph 5). *See* Ex. 1 at 109:15-110:16. *That is all.* Mr. Duffey conceded that he does not have the personal knowledge for any of the statements included in paragraph 3 and 6-10 of his declaration. *See* id. (admitting that he had no personal knowledge for any of the statements in his declaration other than the particular statements from paragraphs 2 and 5 described above).

The Court can, of course, decide this motion on affidavits. Fed. R. Civ. P. 43(c) ("When a motion relies on facts outside the record, the court may hear the matter on affidavits . . . ."). But that does not mean that anything said in an affidavit is admissible. "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. No such evidence has been introduced here. Nor could it have been: Mr. Duffey admits that he lacks personal knowledge for most of

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

what is in his declaration.  Mr. Duffey's statements are thus inadmissible and should be excluded.

### III.    OCULUS HAS NOT COMPLIED WITH ITS DUTY OF CANDOR

This Court has made clear that a party moving for transfer has a special burden to voluntarily disclose material facts.  *See Rockstar Consortium US LP v. Google Inc.*, No. 2:13-CV-893, 2014 WL 4748692, at *8 (E.D. Tex. Sept. 23, 2014), *recon. denied*, No. 2:13-CV-893, 2014 WL 6480772 (E.D. Tex. Nov. 18, 2014) ("The *duty of candor* imposed upon parties in this Court is *especially important in the Motion to Transfer context*, where one side often has exclusive access to a substantial portion of information regarding the locations of relevant evidence, facilities, witnesses, and other pertinent factors.") (emphases added).

Oculus has violated its duty.  Oculus not only failed to voluntarily disclose key material facts, Oculus has also (putting it charitably) purposefully tried to obscure them.  In its motion, Oculus argued that its products are merely displayed and sold at the Best Buy in Plano just like thousands of other products.  Oculus did so despite the fact that (1) it established a special "█████████████████████" within Best Buy where Oculus products are displayed and demonstrated; (2) ███████████████████████████████████████████████████; (3) Oculus representatives demonstrate accused Oculus products to customers at the ████ at fixed, regular times; (4) the Oculus representatives who provide the demonstrations wear clothing, lanyards, and badges bearing Facebook and Oculus logos and trademarks that Oculus provides; and (5) Oculus directs potential customers to the Plano ████ for these demonstrations through its live.oculusvr.com website.  Oculus disclosed *none* of this in its motion papers.

Similarly, Oculus told the Court that "*all* activities related to development of the accused Oculus Rift and Touch products are performed in Menlo Park or Redmond Washington." Motion at 14 (emphasis added).  That is plainly false.  Oculus made this representation to the

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

Court despite the fact that Oculus has an office in Dallas and despite the fact that Oculus's chief technology officer, and his crew of engineers, have worked on accused Oculus products, including both the Rift and the Quest products that are accused in this case.  Oculus did not so much as allude to these facts in its motion.

## IV.   VENUE IS PROPER

Oculus contends that venue is improper because it does not have a "regular and established place of business" in this district under 28 U.S.C. § 1400(b).  According to Oculus, "its only connection to the district" is that "its products are displayed and sold online and through third party-retailers nationwide, including this district."  Motion at 1.  That does not come close to accurately disclosing the true nature of Oculus's presence in this district.

### A.   Oculus Established A "████████████████████" In Plano



In 2016, Oculus established "██████████████████████████ ████████████" within Best Buy stores for the purpose of demonstrating accused Oculus products to potential customers, including a "██████████████████" in Plano.  *See* Ex. 7 [4/2/16 Co-Marketing Agreement]; Ex. 8 [5/7/16 "████████████ ████████████████████ Agreement"].

Under the co-marketing agreement, ██████████████████████████ ████████████████████████████████████████████████████████ ██████████████████.  *See* Ex. 7 ¶ 4 [4/2/16 Co-Marketing Agreement].  The co-marketing agreement also provided that "████████████████████████ ████████████████████████████████."  *Id*. (emphasis added).  Oculus was required to pay for the costs of the necessary fixtures, as well as their deployment, in these ██████████████████.  *Id*.  The co-marketing agreement also specifically provides that "████████████████████████████████████████████████████████

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

██████ " in an initial time frame, increasing to "█████████████████████████████████

████ " in the future.  *Id.* at ¶ 5 (emphasis added).

The "███████████████████████████████████████████████████████████████ "

("██████ Agreement") that Oculus entered into with Best Buy appears to be the "In-Store

Experience Agreement" contemplated by the co-marketing agreement. ████████████████

████████████████████ . *See* Ex. 8 at 1 [██████████ Agreement]. █████████████████

████████     *Id.*

The ██████ Agreement provides further details about the establishment of a "██████████

████████████████████████████████," or "████," for Oculus products.

*Id.* at 2.  The █████████████████████████████████████████████████████████████

█████████████████████████ .  *Id.* ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████ " *Id.* at 3.  And under the ████ Agreement, "████████████████████

██████████████████████████████ " *Id.*  The ██████ Agreement provides that

"█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████ . . . ." *Id.* at 5. █████████████████████████████████

████████████████████████████████ . *Id.* at 4.

The ██████ Agreement required the ████████████████████████████████████████

██████████     *Id.* at 2. ████████████████████████████████████

██████████████████████ . *Id.* ████████████████████████████████████████████

████████████████████████████████████████████████████

████████ . *Id.* at 4.  And it makes ████████████████████████

████████████████████████████████ . *Id.*  at 4.

**\*\* Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only\*\***

### B.     The Oculus "███████████████████████" Experience

Shortly before this lawsuit was filed, Michael Collins, Motiva's investigator, visited the Oculus ██████████████████ Space in Plano, where Oculus representatives provided a demonstration of the accused Oculus Rift system.  Mr. Collins documented the experience in the series of photographs (which is where the pictures shown on the first page of this brief came from).  *See* Ex. 9 [Collins Declaration].

Contrary to what Oculus told the Court, what is happening at Oculus's Plano ████ is not merely the routine display and sale of consumer product by a national retailer. As shown in the photographs, the Oculus Plano ████ includes the special display area that was designed by, that was paid for, and that is owned by Oculus under the ████ Agreement.  It includes large-format graphics displays and signs, which show the accused products, and features prominent Oculus and Facebook logos.  And the Oculus ████ is staffed by Oculus representatives, wearing shirts, lanyards, and badges bearing Oculus and Facebook logos and trademarks, who provide demonstrations of accused Oculus products to customers:



Ex. 10 [OCULUS-MOT-00000091] (produced by Oculus); *see also* Ex. 1 at 54:4-18 [Duffey

Depo] (testifying that the shirt, pullover, lanyard, and badge shown in this picture are worn by the Oculus representatives when they provide demonstrations this district).

Oculus argues that reasonable customers could not possibly think the ████ is a place of business of Oculus because "Oculus products are displayed on shelves, as are many other consumer electronic products (e.g. laptops, cameras, televisions, and the like)" and the "[i]ndividuals who perform the demonstrations are employees of a third-party staffing vendor, not [Oculus]." Motion at 7-8. That is obviously a bad argument in view of the true facts that Oculus omitted from its motion. Plainly, Oculus has purposefully created a ████ experience that makes clear to potential customers that they are dealing with Oculus when they go to Oculus's

████ within the Plano Best Buy to receive a demonstration of Oculus products. Indeed, even Best Buy tells the public that it is "Oculus team members" who perform the demonstrations. *See* Ex. 15 [BB Website].



Experience Oculus Go and Oculus Rift at Best Buy Stores

Get a hands-on demo of Oculus Go and Oculus Rift. Oculus team members will be at select Best Buy stores to guide you through virtual reality features and answer your questions.

Demo Days and Times

Get a hands-on demo of Oculus Go and Oculus Rift. Oculus team members will be at select Best Buy stores to guide you through virtual reality features and answer your questions.

### C. The Mystery "Third Party Vendor" Of Oculus's Motion Is The Vendor *Oculus* Engaged To Staff Its ████ 's With "Oculus ██████████"

Oculus asserts that its ████████████ in Plano cannot be Oculus's place of business because "the individuals who provide the live demonstrations are not [Oculus] employees" but are instead "employees of a third-party staffing vendor," as if that vendor is some random, unrelated third party having nothing to do with Oculus. Motion at 3. But *Oculus* engaged that third-party vendor precisely for the purpose of staffing its ████ 's with *Oculus* representatives.

Oculus engaged Premium Retail Services to provide "████████████████

████████████████████████████████████

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

Plano.  *See* Ex. 11 [PRS Agreement].  The specifics of the relationship between Oculus and Premium Retail Services are set forth in statements of work.  *See* Ex. 12 [PRS 2017 SOW]; *see also* Ex. 13 [PRS 2016 SOW], Ex. 14 [PRS 2018 SOW].  Under the agreement and statements of work, Premium Retail Services is responsible for providing "██████████████████████

██████████████████████████████████████████████ . . . ."  Ex. 12 at 4 (emphasis added).  ████████████████████████████████████████

████████████████████████████████ .  *Id*. at 6.

Oculus has a high degree of control over the Oculus ████████████  provided by Premium Retail Services.  ██████████████████████████████████

██████████████  *Id*. at 4-5.  ██████████████████████████

████████████████████████████ ."  *Id*. at 5.  █████████████

██████████████████████████████████████████████ .  *Id*.

███████████████████████████████████████████████████

██████ .  *Id*. at 4, 5.  ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ .  *See id.* at 5 ("███████████████████

██████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

██████ ") (emphasis added).

**D.    Oculus Directs Customers To Its Plano "███████████████████████"**

Oculus provides demonstrations at its ████████████████████████  at fixed, regular hours.  Oculus advertises those hours on its live.oculusvr.com website.  And Oculus specifically directs local customers to its ████ in Plano through the live.oculusvr.com website.  Indeed, the

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

first thing a visitor to the live.oculusvr.com website experiences is a splash screen asking the user to enter his location so that he can be directed to an Oculus ███. When a customer enters a zip code, the live.oculusvr.com website provides a list of nearby stores where demonstrations are available, and allows the customer to determine the exact hours demonstrations are available. *See* Ex. 16 [Oculus website screen-shots].

  **E. Oculus's "███████████████" Is Oculus's Place Of Business**

  Oculus's ████████████ in Plano meets each of the three requirements of a "regular and established place of business" under the patent venue statute.

  First, a "regular and established place of business" requires a physical place, as opposed to a virtual presence, in the district. *In re Cray Inc.,* 871 F.3d 1355, 1362 (Fed. Cir. 2017). A "place" is a building *or a part* of a building set apart for any purpose or quarters of any kind form which business is conducted. *See id.* (emphasis added). For example, the parts of employees' home used to store inventory and documents qualify as a physical place. *See id.* (citing *In re Cordis*, 769 F.2d 733, 737 (Fed. Cir. 1985)). Oculus's "████████████ ███" in Plano is a physical, non-virtual place that plainly meets the first requirement. Oculus does not dispute this.

  Second, the place must be a "regular and established" place of business. *See id.* That means that it must be established for a meaningful time period. *See id.* It must operate regularly, and not merely temporarily, sporadically, or only for an isolated transaction. *See id.* Oculus's ████████████████ in Plano is a "regular and established" place of business. As described above, Oculus representatives provide demonstrations at fixed, regular hours at the Plano ███. Moreover, the Oculus ███'s were established more than two years ago. Oculus does not dispute that its Plano ███ is a "regular and established" place of business.

  Third, the place must be a place of business "of the defendant." *In re Cray*, 871 F.3d at

**\*\* Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only\*\***

1363. Relevant considerations in determining whether a place of business is "of the defendant" include "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place." *Id*. at 1363. Another consideration is whether it is the defendant who chose to establish the place in the district. *Id*. Marketing and advertising are also relevant to the extent that the defendant holds out a place for its business. *Id*. A defendant's representations that it has a place of business in the district are also relevant. *Id*. at 1363-64. That includes whether the defendant lists the place on a website, or in a telephone or other directory, or places its name on a sign associated with or on the building itself (so long as the defendant actually engages in business from that location). *Id*.

Considering these factors, Oculus's Plano ██████ is plainly a place of business of Oculus.

First, Oculus is leasing the space for its Plano ████████████████████ from Best Buy.  As described above, Oculus has exclusive use of that space, and its pays consideration for that exclusive use through its contractual agreements.  Even if Oculus is not technically "leasing" that space, Oculus is effectively leasing it because Oculus exercises possession and control over the space. ██████████████████████████████████████████ ████████████████████████████████████████ █████████████████.  Moreover, Oculus—and Oculus alone—has the right to conduct business there.  Specifically, Oculus is allowed to direct potential Oculus customers to that location to meet with Oculus representatives who provide demonstrations of Oculus products.

Second, Oculus chose to establish its ████████████████████ in Plano.  Oculus chose the business strategy of providing an Oculus retail experience within existing Best Buy stores for its customers, precisely because Best Buy had a footprint covering major metropolitan areas like Plano, Texas.

Third, Oculus holds out its Plano ████████████████████ as its place of

13

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

business.  As described above, the Plano ███ contains large format graphics that contain numerous Facebook and Oculus trademarks and logos.  Oculus staffs the Plano ███ with Oculus representatives who wear shirts, lanyards, and badges bearing Oculus and Facebook trademarks and logos.  And Oculus directs customers to the Plano ███ if they are interested in a demonstration through its website live.oculusvr.com.  Customers who receive demonstrations at the Plano ███ clearly know they are dealing with Oculus, not Best Buy.

### F.   Oculus Has Committed Acts Of Infringement In The District

Venue is proper if Oculus has committed acts of infringement here, and if Oculus has a place of business here.  28 U.S.C. ¶ 1400(b).  As discussed above, Oculus has a place of business here.  Oculus has also committed acts of infringement here because Oculus representatives have used accused products in this district when performing demonstrations.  Those uses are acts of direct infringement by Oculus in this district.  Oculus has also indirectly infringed in this district by inducing and contributing to direct infringement in this district by its representatives and its customers.

## V.   THE NORTHERN DISTRICT OF CALIFORNIA IS <u>NOT</u> CLEARLY MORE CONVENIENT THAN THIS DISTRICT

In recognition of the deference given to a plaintiff's choice of venue, the law imposes a "significant burden" on a party moving to transfer to show good cause for the transfer:

> Although a plaintiff's choice of venue is not a distinct factor in the venue transfer analysis, *it is nonetheless taken into account as it places a significant burden* on the movant to show good cause for the transfer. *Thus, [the transfer] analysis directly manifests the importance that we must give to the plaintiff's choice.*

*In re Volkswagen of Am., Inc.*, 545 F.3d 304, 314 n.10 (5th Cir. 2008) (*en banc*) (emphasis added).  To prevail on a motion to transfer, the movant must therefore demonstrate that the transferee venue is "clearly more convenient." *Id*. at 315.

Oculus has not come close to meeting its significant burden.  Six of the eight convenience

14

factors weigh against transfer and the remaining two are neutral.

### A. Relative Ease Of Access To Sources Of Proof Weighs Against Transfer

When considering the relative ease of access to sources of proof, the court looks to where documents and physical evidence are kept. The physical location of documents still matters, even if they are electronically accessible from any location. *In re Genentech, Inc.*, 566 F.3d 1338, 1346 (Fed. Cir. 2009); *In re Volkswagen of Am. Inc.*, 545 F.3d 304, 316 (5th Cir. 2008).

Motiva's documents are located in this district. Oculus's documents are stored on servers, which are accessible from any location by a user with the proper credentials. Moreover, all Oculus knows about the location of the physical servers that store its documents is that they are somewhere in one of Facebook's data centers located somewhere on the planet. So this factor weighs against transfer.

### 1. Motiva Has Significant Documentary Evidence Here

Motiva has significant documentary evidence in this district, including the following:

- multiple inventor notebooks;

- tens of thousands of pages, both electronic and paper, of development documentation, including discussions between the inventors, research results, data sheets, costs records and estimates, components lists, photographs and thousands of pages of schematics;

- source code, including firmware, system software, and demonstration games;

- electronic copies of email inboxes for multiple custodians;

- tens of thousands of pages of documents, both electronic and paper, from the prior litigation against Nintendo in the district court and ITC;

- tens of thousands of pages of documents, both electronic and paper, from the *inter partes* reexaminations;

- tens of thousands of pages of documents, both electronic and paper, from the prosecution of the patents-in-suit and their foreign counterparts;

- documents relating to the inventors' work history; and

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

- thousands of pages of draft marketing and business development materials.

*See* Ex. 17 at ¶ 4 [Hughey Decl].  Motiva's corporate documents, business records, and contracts are also located in the district.  *See id.*

Oculus asserts that Motiva's documents in this district do not matter because Motiva is a "newly-incorporated entity" with  "no meaningful connection to this district."  Motion at 1, 3-4. True, after learning that Motiva LLC put up the patents-in-suit for sale through the ICAP patent brokerage, Mr. Hughey and his investors formed a new corporate entity in this district to acquire them. But that made perfect sense because Mr. Hughey and his investors live here.

Mr. Hughey was born and raised in Tyler, Texas.  Ex. 17 at ¶ 5 [Hughey Decl].  He did not leave Tyler until he left home for college at the University of Texas in Austin.  *Id*.  After college, Mr. Hughey lived in Dallas for three years, and then returned to Tyler, where he has lived until the present.  *Id*.  Mr. Hughey and his wife have made their home in this district, where they are raising their three children.  *Id*. at ¶ 6.  Mr. Hughey practices his profession, pays taxes, votes, and attends church in this district. *Id*.  He is also actively involved in the Tyler community, participating in numerous organizations and clubs.  *See id.*  And like Mr. Hughey, the investors in Motiva are longstanding members of the Tyler community.  *See id.* at ¶ 7.  Mr. Hughey established Motiva here because this district is his and their home.  *Id*. at ¶ 8.

So the "present case is not a situation *where a plaintiff from out of the state or country . . .* created a company or office in the Eastern District of Texas to manipulate venue."  *See, e.g., Texas Data Co., L.L.C. v. Target Brands, Inc.,* 771 F. Supp.2d 630, 646 (E.D. Tex. 2011) (emphasis added).  Rather, given Mr. Hughey's and the Motiva investors' longstanding ties to this district, it was "natural and logical for the limited liability company to be formed under Texas law and the office to be located in the Eastern District of Texas."  *Id*.  The location of Motiva's documents should not be discounted merely because Mr. Hughey recently formed a

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

corporate entity to purchase and enforce the patents-in-suit.

### 2.    Oculus's Documents Are Accessible From Anywhere And Are Physically Located "Somewhere On The Planet"

Oculus has submitted no evidence about either the accessibility of its documents or their actual physical location.  The only evidence Oculus has submitted about documents is Mr. Duffey's declaration statement that "[Oculus's] documentation and information regarding the company's general operations, marketing, and finance are *created and maintained* primarily by employees located in either Northern California or Redmond, Washington" and that "no documents relevant to this case are located in Eastern District of Texas."  Dkt. No. 16-2 at ¶¶ 4-5 (emphasis added).

As discussed above, Mr. Duffey's statement is inadmissible because it was based purely on what he was told to say by in-house counsel at Oculus.  *See* Ex. 1 at 107:9-109:2 (testifying that the sole basis for this statement was what he was told by Oculus in-house lawyer Jimmy Yun, and maybe also Oculus in-house lawyer Jack Mecone).  But put that aside for the moment: Mr. Duffey's statement has nothing to do with where its documents can be accessed from or where they are physically stored.  Indeed, when Mr. Duffey said that certain individuals who "create" and "maintain" certain documents are located in California or Washington, he did not mean that those documents are physically stored there:

> Q.  When you declared that in your declaration, I just want to make clear that you weren't trying to say that documentation and information is actually *physically* stored either in hard copy or on *physical* servers that are located in either Northern California or Redmond Washington.  Is that fair?
>
> A.  Correct.

Ex. 1 at 106:11-107:8 [Duffey Depo].  (emphasis added).

Moreover, when deposed as Oculus's corporate representative, Mr. Duffey explained that each of the major systems that Oculus uses, or can use, to store documents is cloud-based or

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

server-based, so that the documents are accessible from any location by a user with the proper credentials, and that all he knew about the location of the physical servers that stored that information was they could be in *any* of Facebook's data centers located anywhere on the planet:

Quip:   Quip is a tool that allows people to share documents and folders.  The physical Quip servers "are global," but Mr. Duffey could not confirm where they are.  Ex. 1 at 97:9-98:6 [Duffey Depo]

DropBox:  Mr. Duffey testified that Facebook uses a company DropBox account to store documents.  All Mr. Duffey could say about the actual servers used for the Facebook DropBox accounts was that they were in "data centers all across the globe . . . ."  *Id*. at 99:18-101:20.

Facebook Workplace:  Facebook Workplace is a tool developed by Facebook that allows companies to communicate, share documents, and look up individuals.  The actual, physical servers for Facebook Workplace are "somewhere on the planet within our data centers."  *Id*. at 101:21-103:11.

Shared Server Space:  "Speaking from [his] experience," Mr. Duffey explained that the legal team has a shared servers to store documents.  He did not know which Facebook data center contained that shared server or if it was located in the Facebook headquarters in Menlo Park.  *Id*. at 103:12-104:5.

Microsoft Office365:  Mr. Duffey identified Microsoft Office365 as a system used by Oculus to store documents.  He confirmed that it was a cloud based service.  He did not know where the actual physical servers were located.  *Id*. at 104:6-105:15.

Perforce:  Mr. Duffey testified that he believed Perforce was used to store source code.  But all he could say about the Perforce servers was that they were located in one of Facebook's global data centers.  *Id*. at 92:2-95:5; 105:23-106:10.

CMS:  Mr. Duffey testified that CMS is a tool that is used to store contracts that is

"accessible where the person was located."  *Id*. at 96:17-97:8.

Because Motiva's documents are in this district, and because Oculus's documents are accessible from any location, and it is unknown where in the world they are physically located, this factor weighs against transfer.

### B.     Availability Of Compulsory Process Weighs Against Transfer

The availability of compulsory process weighs in favor of transfer when more third-party witnesses reside within the transferee venue and when the transferee venue is said to have "absolute subpoena power" over these third-party witnesses.  *In re Volkswagen of Am. Inc.*, 545 F.3d 304, 316 (5th Cir. 2008).  "Absolute subpoena power" is subpoena power for both depositions and trial.  *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009).

There are multiple third-party witnesses who are subject to the absolute subpoena power of this district, but not of the Northern District of California, who are directly relevant to this action because they have worked on accused Oculus products:

Christian Antkow:  Mr. Antokow is a former employee of Oculus Dallas who lives in Garland, Texas.  *See* Ex. 18 [Antkow LI Profile].  Mr. Antkow worked on the Oculus Rift, which is one of the accused products in this case and was a member of the Oculus Dallas team from 2014 to 2018.  *See id.*

Jim Dose:  Mr. Dose is a former employee of Oculus Dallas who lives in the Dallas/Fort Worth area.  *See* Ex. 19 [Dose LI Profile]  Mr. Dose was a software engineer at Oculus.

John Olick:  Mr. Olick was a consultant for Oculus VR from 2013 to 2016, where he "work[ed] on mobile VR with Carmack and crew."  *See* Ex. 20 [Olick LI Profile].

Daniel Taylor:  Mr. Taylor appears to be a former employee of Oculus in Texas. According to his LinkedIn Profile, he is currently employed by Oculus and he is from North Richland Hills, Texas.  Ex. 21 [Taylor LI Profile].  But Mr. Duffey, when deposed as Oculus's

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

30(b)(6) representative, was "not familiar" with him.  Ex. 1 at 43:7-10 [Duffey Depo].  Mr.

Taylor was a Technical Program Manager at Oculus.  He worked on manufacturing, optics,

testing, and product development.  Ex. 21 [Taylor LI Profile].  As technical program manager, he

was responsible for "ensur[ing] cross functional alignment across hardware, software, and

computer vision teams."  *Id*.

Amanda Watson:  Ms. Watson appears to be a former employee of Oculus.  According to

her LinkedIn profile, she is currently an SDK software engineer at Oculus Dallas.  Ex. 22

[Watson LI Profile].  But Mr. Duffey, when deposed as Oculus's 30(b)(6) representative, was

"not familiar" with her.  Ex. 1 at 45:16-24 [Duffey Depo].  The Oculus SDK is, roughly

speaking, the set of hooks into the Oculus operating system that allows game developers to

access its features and functionalities.  It is important to this case because many of the claim

requirements are implemented in the accused Oculus products at the SDK level.

Aaron White:  Mr. White appears to be a former Oculus employee in Texas.  According

to his LinkedIn profile, he is a Sr. Solutions Architect for Oculus VR in Austin.  *See* Ex. 23

[White LI Profile].  But Mr. Duffey, when deposed as Oculus's 30(b)(6) representative, was "not

familiar" with him.  Ex. 1 at 46:23-47:7.

Oculus argues that this factor favors transfer because it has identified three prior-art

patents with inventors who live in California.  Motion at 10.  But there are millions of prior-art

patents.  Defendants can always—and often do—make this argument.  But the Court routinely

rejects it.  *See, e.g., Aloft Media, LLC v. Adobe Sys. Inc*., No. 6:07-cv-355, 2008 WL 819956, *5

(E.D. Tex. Mar. 25, 2008).  In any event, if the location of inventors of prior-art patents that

might be relevant did have any weight in the transfer analysis, Motiva can just as easily identify

potentially relevant prior-art inventors in Texas.  For example, U.S. Patent Nos. 4,375,674;

4,912,638; 6,059576; and 6,152,856 are all prior-art patents with inventors located in Texas.

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only **

Motiva has identified numerous, material third-party witnesses who are subject to this district's absolute subpoena power, but not the subpoena power of the Northern District of California.  Oculus has not identified a single material third-party witness for whom the converse is true.  So this factor weighs against transfer.

### C.    Cost And Convenience Of Witnesses And Parties Weigh Against Transfer

In weighing this factor, the Court credits the location of witnesses specifically identified by name.  *See Novelpoint Learning LLC v. LeapFrog Enters., Inc.*, No. 6:10-cv-229, 2010 WL 5068146, at *6 (E.D. Tex. Dec. 6, 2010) (stating that "the Court will not base its conclusion on unidentified witnesses"); *Tidel Eng'g L.P. v. Fire King Int'l., Inc.,* 2008 WL 899345, at *3 (E.D. Tex. 2008) (discounting movants' claim that unnamed "key witnesses" were located at certain locations for not sufficiently identifying who would be inconvenienced).

Other than the irrelevant prior-art inventor discussed in section B above, Oculus has identified only a single potential witness located in California, Brendan Marten, who will provide financial information related to the accused products.  Motion at 9.  Oculus has not identified a single technical witness.

Motiva, on the other hand, has identified multiple, highly relevant Oculus employees who have worked on accused products out of Oculus's Dallas office—individuals that Oculus utterly failed to acknowledge in its motion.

Most importantly, Motiva has identified John Carmack.  Mr. Carmack is the Chief Technology Officer of Oculus.  *See* Ex. 24 [Carmack LI Profile].  He lives in Corsicana Texas and works in Oculus's Dallas office.  *Id*.  Mr. Carmack personally worked on the accused Oculus Rift, even before he formally joined Oculus.  *See, e.g.*, Ex. 25 at 156:15-25 [Zenimax Vol. 1] (Mr. Carmack testifying that he worked on the Oculus Rift and that it requires <u>his</u> software to

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

work).  Indeed, he worked on very early prototypes of that product.  In 2012, he gave a demonstration of an early prototype—in his office in Texas—to a reporter for Verge.  The inset picture is from a full video of the demonstration available at https://www.youtube.com/watch?v=vIkrQK60N-4. *See also* Ex. 42 [5/13/12Verge Article] (describing "John Carmack's prototype head mounted display" and "Carmack's big contribution" of "algorithms



used to optimize the code for HMDs and lower latency, some specially designed for Rift").

Mr. Carmack also demonstrated an early version of the Rift at the E3 conference.  The inset picture from the E3 conference is part of a full video that can be viewed at https://www.youtube.com/watch?v=NYa8kirsUfg (E3 Video).  This was all before Mr. Carmack officially joined Oculus in 2013.  *See* Ex. 25 at 168:1-17 [ZeniMax Vol.1].  Mr. Carmack's early work with Oculus, before he left ZeniMax and before he (formally) joined Oculus, was so significant that it led to litigation between Oculus and ZeniMax—litigation that resulted in a multi-hundred million dollar verdict and judgment against Oculus.  *See* Ex. 39 [Judgement].



Mr. Carmack continues to work on Oculus products, including specifically the Oculus Quest, the second Oculus product accused of infringement in this case.  Indeed, Mr. Carmack

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

recently spoke at great length—and in great technical detail—about the details of the accused Oculus Quest product when he delivered the keynote speech on day two of Oculus's annual "Connect" conference.  (The complete video can be viewed at https://www.youtube.com/ watch?v=VW6tgBcN_f.)  That video alone makes him a very important witness.

Numerous other engineers and developers who work in Oculus's Dallas office are directly relevant to this action because they have worked on accused Oculus products:

- Curtis Arink, is a software engineer at Oculus Dallas.  Ex. 26 [Arink LI Profile].
- Cass Everitt is an engineer from Austin who work for Oculus.  Ex. 27 [Everitt LI Profile].
- Matt Hooper is the Director of Development at Oculus Dallas.  Ex. 28 [Hooper LI Profile].
- Gloria Kennickell is a software engineer for "mobile core engineering," and also works at Oculus Dallas.  Ex. 29 [Kennickell LI Profile].
- Deepak Ranganathan is another software engineer at Oculus Dallas.   Ex. 30 [Ranganathan LI Profile].
- Jason Vogelzang is a Test Analyst II at Oculus Dallas and lives in Grapevine, Texas.  Ex. 31[Vogelzang LI Profile].
- Andrew Welch is a Senior Software Engineer at Oculus Dallas.  Ex. 32 [Welch LI Profile].
- John Pollard is another software engineer at Oculus and he is from Mckinney.  Ex. 33 [Pollard LI Profile].
- Jonathan Wright, works at Oculus Dallas, he is "the engineering manager for the Oculus Mobile Core team" which produces and maintains the software development kit (SDK) and runtime for all Oculus mobile VR products, including the accused Oculus Quest product.  Ex.  34 [Wright LI Profile].
- Eric Duhon is a software engineer at Oculus in the Dallas area.  Ex. 40 [Duhon LI Profile].
- Jason Kim is a video game producer at Oculus Dallas.  Ex. 41 [Kim LI Profile].

Additionally, William Hughey, the manager of Motiva Patents, is a key witness who lives and works in this district.  *See* Ex. 17 at ¶¶ 3, 6.  Mr. Hughey will be a trial witness who will testify at least about the Motiva entity, the purchase of the patents-in-suit, and ownership of the patents-in-suit.  *See id.* at ¶ 9.

Because all but one of the relevant witnesses specifically identified by the parties are

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

located in nor near this district, this factor weighs against transfer.

### D.      Other Practical Problems Weigh Against Transfer

Under this factor, judicial economy "can play a significant role" and can even "dominate

the court's transfer analysis." *In re Google*, 2017 WL 977038, * 2 (Fed. Cir. 2017) (citing *In re*

*Vistaprint Ltd*., 628 F.3d 1342, 1347 (Fed. Cir. 2010)).  True, the Court cannot ignore the

existence of transfer motions, or their underlying merits, in co-pending cases said to give rise to

judicial efficiency.  *Id*. (reversing denial of transfer where all defendants had co-pending motions

to transfer).  But neither HTC nor Sony have sought a transfer in the co-pending cases.  So the

judicial inefficiency that would result from granting Oculus's motion weighs against transfer.

### E.      Court Congestion Weighs Against Transfer

Oculus argues, without citation to any authority, that this factor is neutral because

"similar number of cases are pending before each judge at both districts."  Motion at 14.  But

"this factor favors a district that can bring a case to trial *faster*."  *Net Nav. Sys., LLC v. Cisco*

*Sys., Inc.*, 2012 WL 7827544, *6 (E.D. Tex. Aug. 24, 2012) (emphasis added).; *see also In re*

*Genentech*, 566 F.3d 1338, 1347 (Fed. Cir. 2009) ("To the extent that court congestion is

relevant, the *speed with which a case can come to trial* and be resolved may be a factor.")

(emphasis added).

Trial is faster here.  *See, e.g.,* Ex. 35 at 14 [2018 PwC Patent Litigation Study] (reporting

six month faster median time to trial in patent cases terminated in the last ten years); Ex. 36 at 22

[DocketNavigator 2017 Retrospective:  Patent Litigation Special Report] (reporting an average

time to trial three and one half months faster for cases terminated in the last three years, and

more than eight months quicker for cases terminated in the last ten years); Ex. 37 [3/31/18

Federal Judicial Center Statistics—Table C5] (reporting median time to disposition during trial

that is more than three months faster in civil cases terminated in the last year).  So this factor

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

weighs against transfer.  *See* Ex. 38 at 20 [*Agis Software Development LLC v. HTC Corp.,* No. 2:17-cv-514, Dkt. No. 77 (E.D. Tex. Sept. 28, 2018)] ("Though statistics may vary slightly by source, this Court has consistently found that median time to trial in this District is several months faster than the Northern District of California.").

### F.      Local Interest Weighs Against Transfer

Finally, local interest weighs against transfer because both plaintiff and defendant have an important presence in Texas.  Oculus's significant presence in Texas gives this district a strong local interest in this matter.  *See, e.g., In re Hoffman-La Roche Inc.,* 587 F.3d 1333, 1336 (Fed. Cir. 2009) (holding that the district's "local interest in this case remains strong because the cause of action calls into question the work and reputation of several individuals residing in or near that district").  And Motiva's location also gives this district a strong local interest.  *iFly Holdings v. Indoor Skydiving Germany GMBH,* No. 2:14-cv-01080, 2015 WL 5909729, at *5 (E.D. Tex. Oct. 7, 2015) ("Texas residents have a strong interest in deciding a patent infringement dispute involving a patent owned by a Texas company.").

### G.      Familiarity With Governing Law Is Neutral

The parties agree that this factor is neutral.  Motion at 14.

### H.      Avoidance Of Conflict-Of-Law Issues Is Neutral

The parties agree that this factor is neutral.  Motion at 14.

## VI.      CONCLUSION

For the foregoing reasons, the Court should deny Facebook's motion to dismiss for improper venue and should also deny its alternative request for transfer to the Northern District of California.

Dated: January 25, 2019                                Respectfully submitted,

                                                       /s/ *Matthew J. Antonelli*
                                                       Matthew J. Antonelli (lead attorney)

** Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only**

Texas Bar No. 24068432
matt@ahtlawfirm.com
Zachariah S. Harrington
Texas Bar No. 24057886
zac@ahtlawfirm.com
Larry D. Thompson, Jr.
Texas Bar No. 24051428
larry@ahtlawfirm.com
Michael D. Ellis
Texas Bar No. 24081586
michael@ahtlawfirm.com
Christopher Ryan Pinckney
Texas Bar No. 24067819
ryan@ahtlawfirm.com
ANTONELLI, HARRINGTON
& THOMPSON LLP
4306 Yoakum Blvd., Ste. 450
Houston, TX 77006
(713) 581-3000

Stafford Davis
State Bar No. 24054605
sdavis@stafforddavisfirm.com
Catherine Susan Bartles
Texas Bar No. 24104849
cbartles@stafforddavisfirm.com
THE STAFFORD DAVIS FIRM, PC
The People's Petroleum Building
102 N College Ave., 13th Floor
Tyler, Texas 75702
(903) 593-7000

*Attorneys for Motiva Patents, LLC*

**\*\* Filed Under Seal—Highly Confidential—Outside Attorneys Eyes Only\*\***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of January, 2019 I served the foregoing on all opposing counsel by email.

*/s/ Matthew J. Antonelli*

Matthew J. Antonelli

## <u>CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL</u>

I hereby certify that I am authorized to file this document under seal because it contains information designated "Highly Confidential—Outside Attorneys Eyes Only" by Oculus and I have filed a Motion for Leave to Seal pursuant to Local rule CV-5(a)(7)(A).

*/s/ Matthew J. Antonelli*

Matthew J. Antonelli

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | |
|---|---|
| MOTIVA PATENTS, LLC, | CIVIL ACTION NO. 9:18-cv-178 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| FACEBOOK TECHNOLOGIES, LLC F/K/A OCULUS VR, LLC, | |
| Defendant. | |

**Order**

Before the Court is the motion of Motiva Patents for leave to file its response (and supporting documents) to Facebook Technologies LLC's motion to dismiss for improper venue, or, alternatively, to transfer to the Northern District of California.  The Court having considered the motion, and having found good cause therefor, hereby ORDERS that the motion is GRANTED.